UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WILLIAM SMITH,

               Petitioner,

-vs-

CALVIN WEST, Superintendent of
Elmira Correctional Facility,

               Respondent.
_____

**No. 04-CV-0413(VEB)**
**DECISION AND ORDER**

## I.    **Background**

*Pro se* petitioner William Smith ("Smith" or "petitioner") has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, seeking release from state custody on the basis that his judgment of conviction following a jury trial on two counts of Robbery in the First Degree, one count of Burglary in the First Degree and one count of Assault in the First Degree.

The prosecutor's proof at trial showed that on March 26, 1996, petitioner attacked the victim at her home, presumably with a knife, slitting her throat and inflicting numerous other wounds. The victim, who knew petitioner as "Billy Smith", identified him as her attacker. T.75.[1] She had seen him at her home three times before the incident. T.61, 63. On the first occasion, a few months before the incident, someone claiming to be petitioner's uncle introduced petitioner to the victim. T.62. Petitioner's uncle wanted petitioner to meet the victim because petitioner was "new in town". *Id.* Petitioner had been released from prison on January 16, 1996, about three months prior to the attack. T.197.

---

[1]      Citations to "T.__" refer to pages of the trial transcript.

On the two other occasions that the victim saw petitioner at her house, petitioner claimed he was looking for her upstairs tenant, who rented the upstairs apartment to keep three pit bull dogs. T.49, 62-63. (The tenant with the pit bulls did, in fact, see petitioner at the victim's house on one of those occasions. T.50-51.) The victim suggested that her tenant had been selling drugs, given that her home was known as a "drug house" with a lot of "traffic" going through there. T.85. The victim admitted to using drugs herself. T.85.

On the night of the attack, petitioner came over to the victim's house at about 9:00 p.m., knocked on the door, and announced that it was "Billy". T.63-64. Recognizing petitioner's voice, the victim let him in. T.64. Petitioner said that he and his girlfriend were having problems with their landlord and wanted to move out. T.65. It appears that petitioner knew that the victim's upstairs apartment was available for rent because the tenant with the pit bulls had vacated it. T.65. According to petitioner, he wanted his girlfriend to meet the victim to discuss rent, and said he would return a while later. T.65.

At around 11:00 p.m., petitioner returned without his girlfriend, claiming that she was busy, but that she would call or page him when she was available. T.66. The victim asked petitioner to go home and wait at his house until his girlfriend was ready to meet with them. T.66. Petitioner agreed. T.67.

As the victim turned and walked away, petitioner slit her throat, presumably with a knife. T.67-68, 74.  She tried to fight, but fell to the ground where petitioner slashed her again. T.68. She stayed on the floor in an attempt to prevent any further attack. T.68. Before she passed out, she saw petitioner reach down and take her watch. T.68-69

When she regained consciousness, petitioner was gone. T.69. She went to the phone, but

the cord was cut. T.69. She removed the cut cord, plugged the phone into the wall outlet, called 911 and told them that she had been attacked by "Billy" T.69-70, 101-02. She was very weak and believed she was dying. T.70.

When the paramedics arrived at the scene, the victim said that she knew who attacked her. T.40, 47. She also told the police that her assailant was named "Billy". T.70-71. As for a description, the victim told the police that "Billy" was a short, black male with a light complexion, curly hair and a medium build. T.71. The victim was taken to the hospital, where she was admitted for five days. T.72. She received treatment for the slash to her neck and the numerous other wounds she received to her face, neck and arms. T.72. At the time of trial, the victim had nerve damage in one of her arms, which resulted in a loss of sensation to her fingers T.72. She also had scars from the attack. T.73. The treating physician at the hospital testified that the victim's injuries were not only life threatening, but also caused serious and protracted disfigurement. T.174-76.

Significantly, at the victim's house, the police found a piece of paper that said "Billy" and had a phone number on it. T.123-24, 146-47. The police obtained an address for the phone number through 911. T.124-25, 147. When the police arrived at the address, they met a woman who identified herself as either petitioner's mother or grandmother. T.143-44, 147). The woman owned the house there. T.143-44. The police asked to look inside the house, but they were not given permission to do so. T.134-35, 147- 48. People at the house kept asking the police, "what happened?" T.147-48). There were lights on inside the basement, but the police did not know who was there. T.135-36, 147-48. Ultimately, the woman who said she was petitioner's mother or grandmother directed the police to a home down the street where petitioner was living with

his sister. T.136, 143-44, 148). When the police arrived at the home, petitioner's sister answered the door and said petitioner was not there. T.137, 247-48). The police searched the home by permission and did not find petitioner. T.137.

Petitioner presented evidence on his own behalf. In support of a defense of mis-identification, petitioner called his parole officer to testify that petitioner was released from prison on January 16, 1996. T.197, supposedly contradicting the victim's approximation that she had met petitioner for the first time in November or December of 1995. T.78-79. Petitioner also called his brother and sister in support of an alibi defense. They testified that petitioner was with them on the day of the crime from 7:00 p.m. until 11:00 p.m., when petitioner went to the store with his girlfriend for about ten minutes. T.210-14). Petitioner's sister testified that petitioner was home when the police arrived. T.218.

In rebuttal, the prosecution called a police officer who testified that when the police spoke to petitioner's sister, she stated that petitioner was not there. T.247-48.

The jury returned a verdict convicting Smith of first degree assault. He was sentenced as a persistent violent felony offender to a prison term of sixteen years to life.

After sentencing, Smith filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure ("C.P.L.") § 440.10 which was denied by the trial court. The Appellate Division denied petitioner's application for leave to appeal.

On direct appeal, the Appellate Division unanimously affirmed the judgment of conviction. Leave to appeal to the Court of Appeals was denied. *People v Smith*, 306 A.D.2d 861 (App. Div. 4th Dept.), *lv. denied*, 100 N.Y.2d 599 (N.Y. 2003).

Smith then filed this petition for a writ of habeas corpus in which he alleges the following

grounds for relief: (1) ineffective assistance of trial counsel; (2) the prosecution violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

For the reasons set forth below, Smith's request for a writ of habeas corpus is denied and the petition is dismissed.

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

### III.   " Adequate and Independent" State Ground Doctrine and Procedural Default

It is a well-settled aspect of federal habeas jurisprudence that if "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred" absent (1) a showing of cause for the default and actual prejudice attributable thereto, or (2) a showing that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  A state ground will create procedural default sufficient to bar habeas review if the state ground first was an "independent" basis for the decision; this means that "the last state court rendering a judgment in the case clearly and expressly state[d] that its judgment rests on a state procedural bar." In addition, the state procedural bar must be "adequate" to support the judgment-that is, it must be based on a rule that is" 'firmly established and regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24  (1991)).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the

merits in the alternative. *See Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989) ("a state court need not fear reaching the merits of a federal claim in an alternative holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Dunham v. Travis*, 313 F.3d 724, 729 (2d Cir.2002) ("[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, I .e., that he is actually innocent of the crime for which he has been convicted.").

## IV.   Analysis of the Petition

### A.   Ground One: Ineffective Assistance of Trial Counsel

#### 1.   General Legal Principles

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose-"to ensure a fair trial"-and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as

having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to

prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation

"fell below an objective standard of reasonableness" measured under "prevailing professional

norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different," *id.* at 694. A

"reasonable probability" is "a probability sufficient to undermine confidence in the outcome."

Strickland, 466 U.S. at 694. The performance and prejudice prongs of *Strickland* may be

addressed in any order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground

of lack of sufficient prejudice . . . that course should be followed." *Id*. at 697.

> ## 2. Analysis of the Alleged Bases of Ineffectiveness by Smith's Trial Counsel

> ### a. Failure to object when the state denied him fair notice of the charges against him by changing the theory of the prosecution (Ground One)

According to petitioner, the prosecutor addressed the counts of the indictment in reverse

order during summation; argued in summation that petitioner slashed the victim's throat and left

her to die; and elicited expert testimony that the victim's injuries were life threatening. In a

motion to vacate the judgment pursuant to C.P.L. § 440.10, petitioner raised these issues and

argued that "trial counsel rendered ineffective assistance . . . when counsel allowed the

prosecution to change the People's theory which was held [sic] during the grand jury

proceedings . . . ." Petition at 3 (Docket No. 1). The trial court ruled that these claims were

procedurally barred because they were matters of record, properly reviewable on direct appeal.

*See* N.Y. CRIM. PROC. LAW § 440.10(2)(c); County Court Order dated April 5, 2002.

As respondent argues, the trial court relied upon C.P.L. § 440.10(2)(c) which, under the

circumstances here, is an adequate and independent state ground that bars federal habeas review of this claim of ineffective assistance unless the habeas petitioner can overcome the procedural default. *E.g., Sweet v. Bennett*, 353 F.3d 135, 139-40 (2d Cir. 2003). Smith has failed to show cause and prejudice, or that a fundamental miscarriage of justice will occur should this Court decline to hear the claim. Accordingly, it is dismissed.

   **b.**  **Failure to properly present alibi testimony dealing with the introduction of a photograph and failure to properly present testimony from petitioner's parole officer that petitioner was in prison at the time the victim claims she met him (Ground Two)**

Petitioner exhausted the part of this ground dealing with the testimony from the parole officer regarding the length of time petitioner was incarcerated by raising it on direct appeal. The aspect of Ground Two with the introduction of a photograph was raised by Smith in his C.P.L. § 440.10 motion, but the state court ruled that it was procedurally barred because it was a matter for direct appeal. See N.Y. CRIM. PROC. LAW § 440.10(2)(c); County Court Order dated April 5, 2002.

Petitioner wanted his parole officer to testify about the dates petitioner was in prison, and to introduce a photograph depicting the length of petitioner's hair. The parole officer testified that she was unable to locate petitioner's file and could only say that he was incarcerated for an unknown duration until he was released on January 16, 1996. T.196-98. The parole officer had a poor recollection of petitioner's hair and could only obtain a blackened-out, fax-copy of a photograph of petitioner taken at the time of his release from prison in 1996. T.198-200. Because defense counsel called petitioner's brother and sister who testified about petitioner's hair and the period of time he was in prison, *see* T.209, 222-23, 240, counsel was not ineffective for placing

the parole officer on the stand to offer testimony about those topics on which she had personal knowledge. The parole officer did not offer any inculpatory information or contradict petitioner's alibi evidence as proffered by his brother and sister. As respondent points out, it is entirely speculative whether the parole officer could have given exculpatory testimony relative to petitioner's hair-length since this claim because it is unsupported by an affidavit from the parole officer or any other evidence.

As respondent argues, the date was relevant only to the extent it contradicted the victim on a collateral matter regarding the date she first met petitioner, not the date the crime was committed. Thus, even if the officer could have corroborated petitioner's brother and sister regarding petitioner's release date from prison, there is no reasonable probability that it would have resulted in a more favorable verdict for petitioner. As petitioner has failed to show that he was prejudiced by trial counsel's performance in this regard, much less that counsel was professionally unreasonable in his handling of the parole officer's testimony, this claim must fail.

        **c.**       **Failure to object to the People's presentation of a rebuttal witness to rebut the testimony of petitioner's sister, who offered alibi testimony on his behalf (Ground Three)**

In Ground Three of his ineffective assistance of counsel claim, petitioner asserts that counsel failed to object to the People's presentation of a rebuttal witness to rebut the testimony of petitioner's sister, who offered an alibi." Petitioner raised this claim in a C.P.L. § 440.10 motion, and the state court ruled that the claim was procedurally barred because it was a matter of record for direct appeal and, in any event, without merit.

Petitioner's sister testified that he was at home at the time of the crime. The prosecution

called a police officer "in rebuttal to discredit the defendant's alibi." The officer testified that

when he went to petitioner's home on the night of the crime, petitioner was not there and his

sister said that she had not seen him and did not know where he was. T.247-48. Because the

officer was properly called as a rebuttal witness, *see* N.Y. CRIM. PROC. LAW § 250.20(2),[2]

defense counsel was not ineffective in failing to object. *See Collins v. Bennett*, No. 01-CV-6392,

2004 WL 951362, at *11 (W.D.N.Y. Apr. 13, 2004) (Siragusa, D.J.) ("Thus, the testimony

concerning the diary offered at trial was within the bounds of the court's ruling, and any

objection by defense counsel most likely would have been overruled.  In light of the trial record,

the Court cannot find that defense counsel was professionally unreasonable in failing to object to

the diary on the foregoing grounds, much less that [petitioner] was impermissibly prejudiced in

this regard.")

> **d.     Failure to consult with a handwriting expert to analyze whether petitioner was right- or left-handed (Ground Four)**

In ground four of his ineffective assistance of counsel claim, petitioner contends that his

attorney failed to call a handwriting expert to analyze whether he was left or right handed.

According to petitioner, the wounds on the victim were consistent  with a person who is left

handed and tall, whereas petitioner contends that he is right handed. Petitioner raised this claim

in his C.P.L. 440.10 motion, and the state court ruled that the claim was procedurally barred

---

[2]         "Within a reasonable time after receipt of the defendant's witness list but not later than ten days before trial, the people must serve upon the defendant or his counsel, and file a copy thereof with the court, a list of the witnesses the people propose to offer in rebuttal to discredit the defendant's alibi at the trial together with the residential addresses, the places of employment and the addresses thereof of any such rebuttal witnesses. A witness who will testify that the defendant was at the scene of the crime is not such an alibi rebuttal witness. For good cause shown, the court may extend the period for service of the list of witnesses by the people." N.Y. CRIM. PROC. LAW § 250.20(2).

because it was a matter of record for direct appeal, *see* N.Y. Crim. Proc. Law § 440.10(2)(c), and, in any event, without merit. The trial court commented, "[T]aking into account not only that petitioner's brother and sister did in fact testify that he was right handed ([T.]205, 240), and Dr. Flynn's testimony that the crime could have been committed by either a right or left handed individual ([T.]186), counsel could have reasonably concluded that additional evidence of petitioner's being right handed, even if available, would have been cumulative and not necessarily exculpatory." County Court Order dated April 5, 2002.

It is well settled that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987); *see also United States v. Aiello*, 900 F.2d 528, 532-33 (2d Cir.1990) (trial counsel's decision not to call two allegedly exculpatory witnesses and a handwriting expert was not ineffective assistance); *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (decision whether to call witnesses is a tactical decision). Smith's claim rests only on speculation; he has provided no affidavit or other basis on which to conclude that there existed a witness who could have offered relevant and probative evidence contrary to the testimony offered by Dr. Flynn. Thus, "the decision of trial counsel not to call an expert 'cannot be considered objectively unreasonable'" given that Smith "'has only presented his vague hope that another expert might have reached a different result than the government expert.'" *Savinon v. Mazucca*, No. 04CIV1589RMBGWG, 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005), *report and recommendation adopted*, 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006) (NO. 04 CIV. 1589(RMB)(GW), *aff'd mem.*, No. 07-0940-PR, 318 Fed. Appx. 41 (2d Cir. Mar. 31, 2009)

(quoting *Leaks v. United States*, 841 F. Supp. 536, 545 (S.D.N.Y.1994) (footnote omitted), *aff'd*, 47 F.3d 1157 (2d Cir.), *cert. denied*, 516 U.S. 926 (1995); citing *United States v. Morales*, 1 F. Supp.2d 389, 393 (S.D.N.Y.1998) (rejecting claim that counsel was ineffective where defendant "made no showing" that trial counsel's decision not to call "unidentified . . . witnesses was unreasonable in light of the circumstances of th[e] case")); *see also Stapleton v. Greiner*, No. 98 CV-1971 (RR), 2000 WL 1207259 at *14 (E.D.N.Y. July 10, 2000) (counsel not ineffective for failure to call an expert to authenticate potential evidence because petitioner came "forward with no affidavits or other admissible evidence indicating that any expert witness could have identified the voices or handwriting as [petitioner] proposes. Absent such evidence it is difficult to imagine any prejudice."). Thus, this claim must also fail.

> **e.** **Failure to present documentary proof establishing his innocence and object to the photo array received into evidence at the *Wade* hearing (Ground Five).**

In Ground Five of his ineffective assistance of counsel claim, Smith asserts that counsel failed to present documentary proof establishing his innocence, and failed to object to the photo array received in evidence at the *Wade* hearing. It appears that petitioner is referring to the claim raised in his *pro se* supplemental brief on direct appeal that his prior assault conviction established he was right-handed. This claim is technically unexhausted because petitioner did not raise this claim in his application for leave to appeal to the New York Court of Appeals. Respondent's Memorandum of Law in Opposition to the Habeas Petition ("Resp't Mem.") 15; Petitioner's Pro Se Application for Leave to Appeal. However, it should be "deemed" exhausted but procedurally defaulted because Smith has already used the one direct appeal to which he is entitled under New York state law, and if he were to raise the claim in a C.P.L. § 440.10 motion

to vacate the judgment, it would be dismissed because it should have been raised on direct appeal. *See* N.Y. CRIM. PROC. LAW § 440.10(2)(c); N.Y. COURT RULES § 500.10(a); *Grey v. Hoke*, 933 F.2d 117, 119-21 (2d Cir. 1991); *Sweet v. Bennett*, 353 F.3d at 139-40 (noting that N.Y. CRIM. PROC. LAW § 440.10(2)(c) acts as independent and adequate state ground barring federal habeas review of ineffective assistance of counsel claim where the basis of Sixth Amendment issue involves alleged errors well established in the trial record). Petitioner has failed to establish cause and prejudice to excuse the default, or that a fundamental miscarriage of justice would occur should this habeas court decline to review the claim.

In any event, the claim is without merit, since, as respondent points out, petitioner has failed to show that his prior assault conviction proved he was right handed. Moreover, being right- handed was not necessarily a defense to the charges; as previously noted, Dr. Flynn testified that the crime could have been committed by someone who was either left *or* right handed. This claim is dismissed.

### f. Failure to assert an argument under the "merger doctrine"

Petitioner asserts in ground six of his ineffective assistance of counsel claim that his attorney failed to argue that pursuant to *People v. Gillens*, 135 A.D.2d 335, the "merger doctrine" required *vacatur* of the assault conviction. This claim is without merit. As noted in the state

court's decision in petitioner's C.P.L. § 440.10 motion:

> In any event, there is no merit to the Defendant's assertion that his conviction of Assault in the First Degree is repugnant to or merges with the acquittal of the robbery charge. The Defendant's reliance upon *People v. Sanchez* (128 AD2d 377[, App. Div. 1st Dept. 1987]) and *People v. Gillens* (138 AD2d 335[, App. Div. 1st Dept. 1988]) is misplaced. In those actions, the appeals court reversed convictions of Assault in the Second Degree ([N.Y.] Penal Law, Sec. 120.05(6))

-14-

involving the causation of physical injury in the course of the commission of a felony, because the jury had acquitted the Defendant of the underlying felony. Here however, the Defendant was convicted of assault under the theory of intent to injure, as defined by [N.Y.] Penal Law, Sec. 120.10[(]1[)].

*See* County Court Order dated April 5, 2002. Because the omitted argument was not meritorious under state law, it was not unreasonable of trial counsel to decline to assert it. Furthermore, since the argument would not have succeeded, Smith has not shown how he was prejudiced by the omission.[3]

### B.      Ground Two:      Violation of *Brady v. Maryland*, 373 U.S. 83 (1963)

The government's *Brady* obligation to disclose "material" evidence "favorable" to a criminal defendant applies to both exculpatory evidence and impeachment evidence. *E.g.*, United *States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998) (citing, *inter alia*, *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,'" *Orena*, 145 F.3d at 557 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks and citations omitted)). Under federal law, "[t]he People have no duty to disclose evidence whose exculpatory value is merely speculative." *Musa v Senkowski*, Nos. 02-CV-6113, 03-MISC-0066, 2004 WL 502556, at *14 (E.D.N.Y. Mar. 15, 2004) (citing *Tate v. Wood*, 963

---

[3]      I note that the "merger doctrine" is judicially-created doctrine in New York State, and is typically applied in kidnaping cases. *E.g.*, *People v. Dinsio*, 286 A.D.2d 517, 520, 729 N.Y.S.2d 208, 219 (App. Div. 3d Dept. 2001) ("The merger doctrine is intended to preclude conviction for kidnapping based on acts which are so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them."); *People v. Pellot*, 105 a.D.2d 223, 224 (App. Div. 2d Dept. 1984) (citations omitted). Federal courts have held that stand-alone claims of violations of New York's "merger doctrine" are not cognizable on habeas review. *E.g., Mackenzie v. Portuondo*, 208 F. Supp.2d 302, 323 (E.D.N.Y. 2002) (" Petitioner claims that, in violation of state law, the trial court erred because it did not apply the "merger doctrine" and did not dismiss the Unauthorized use of a Motor Vehicle charge as a lesser included offense of Robbery. . . . Here, the Petitioner's claims are based entirely on alleged state law violations. The Petitioner has not alleged, much less proven, that the supposed state law errors violated his federal constitutional rights.").

F.2d 20, 25 (2d Cir. 1992) ("[T]the state need not disclose preliminary or speculative information . . . .") (citing *United States v. Agurs*, 427 U.S. 97, 109 & n. 16 (1976)).

Smith contends that a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), occurred in connection with a piece of paper with the name "Billy" and a phone number on it that was found at the scene of the crime. However, that piece of paper could not be located and was not produced at trial. Upon being informed of the loss of the evidence, Smith's defense counsel raised a *Brady* objection and sought dismissal of the indictment, a mistrial or an adverse inference charge. The trial court granted the defense request for a jury instruction, but the instruction it gave did not include the language requested by petitioner's counsel. Upon trial counsel's objection, the trial court issued a supplemental instruction, to which defendant did not object.

Although Smith has couched his claim as a *Brady* violation, it may also be precisely is analyzed under the right to present a defense doctrine. *Accord*, *e.g.*, *Edmonds v. Purdy*, No. 08 Civ. 8808(DLC)(AJP), 2009 WL 483189, at *12 (S.D.N.Y. Feb. 26, 2009) (petitioner's claim that the prosecution violated her constitutional rights when it failed to produce "potentially exculpatory evidence", a surveillance video of the lobby of the building where the robbery occurred and which was lost by the police, is properly analyzed under the right to present a defense doctrine) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)), *report and recommendation adopted*, 2009 WL 1357953, No. 08 CIV. 8808(DLC), (S.D.N.Y. May 14, 2009). In *Trombetta*, the Supreme Court explained that

> [u]nder the Due Process Clause of the Fourteenth Amendment, criminal
> prosecutions must comport with prevailing notions of fundamental fairness. We
> have long interpreted this standard of fairness to require that criminal defendants
> be afforded a meaningful opportunity to present a complete defense. To safeguard

that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." ... Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

467 U.S. at 485; *accord*, *e.g.*, *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

To establish a violation of the right [to present a defense], a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means. In addition, we have held that a defendant pressing such a claim must show bad faith on the part of the government. Finally, in order to elevate this misconduct to a due process violation, the defendant "must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."

*United States v. Williams*, 205 F.3d 23, 29-30 (2d Cir.) (citations omitted), *cert. denied*, 531 U.S. 885 (2000); *accord*, *e.g.*, *Buie v. Sullivan*, 923 F.2d 10, 11-12 (2d Cir.1990) ("Against these requirements–materiality, bad faith, and lack of fundamental fairness–[the] petition fails.").

When Smith raised this claim on direct appeal, the Appellate Division held that "[b]y failing to object to the supplemental charge, defendant is deemed to have been satisfied by the relief afforded" with regard to the note. *Id.* (citing *People v. Whalen*, 59 N.Y.2d 273, 280 (N.Y. 1983) ("When a Judge grants a request to charge and then fails to deliver the charge as requested, the requesting party has an obligation to draw the error to the Judge's attention. Inasmuch as defendant's request was initially granted and his comments after the charge did not alert the Trial Judge to the error so as to afford an opportunity to correct himself, defendant must be deemed to have waived any objection to the alibi instruction."). The Appellate Division further held that "[i]n any event, '[t]he exculpatory potential of this evidence being purely speculative, its destruction by the police does not violate the *Brady* rule[.]'" *Id.* (quoting *People v LaBounty*, 127 A.D.2d 989, 989 (App. Div.), lv. denied, 69 N.Y.2d 1005 (N.Y. 1987); citation

omitted).

As respondent points out, the lost note actually was *inculpatory* because it led the police from the victim's home to petitioner's home. Much later, at trial, Smith's defense counsel made an argument that it had exculpatory value. Supposedly, petitioner called his sister and brother who claimed that neither their mother nor grandmother lived at the first address the police visited pursuant to the note found in the victim's house. T.216-17, 233-34. He also claimed the note was exculpatory because there may have been another "Billy Smith" who was being protected by the woman who allegedly falsely informed the police she was petitioner's mother or grandmother. As respondent argues, that was pure speculation and fails to convince this Court that the note was exculpatory. Accordingly, the Appellate Division's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See, e.g., United States v. Jobson*, 102 F.3d 214, 218 (6th Cir.1996) (erasure of radio dispatch tape not violative of due process where "[t]here is no evidence that anyone in the Detroit Police Department or the U.S. Attorney's Office suspected that the tape was exculpatory").[4]

---

[4]    *See also United States v. Femia*, 9 F.3d 990, 995 (1st Cir.1993) (no violation of due process where "[t]he evidence before the district court showed that any missing evidence . . . did not possess exculpatory value apparent before law enforcement destroyed the tapes"); *United States v. Rastelli*, 870 F.2d 822, 833 (2d Cir.) (no due process violation where "neither the missing tapes nor the bid documents contained exculpatory evidence that was apparent before they were lost"), *cert. denied*, 493 U.S. 982, 110 S.Ct. 515 (1989); *Little v. Armontrout*, 835 F.2d 1240, 1245 n. 8 (8th Cir.1987) ("We reject [petitioner]'s argument that destruction of the tapes . . . violated due process. It has not been shown that the tapes had an exculpatory value that was apparent before they were destroyed."), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857 (1988); *United States v. Tugwell*, No. 98-10479, 187 F.3d 650 (table), 1999 WL 510769 at *1 (9th Cir. July 12, 1999) (affirming trial court's denial of motion to dismiss indictment based on destruction of evidence; "[a]ny exculpatory value in fingerprint evidence on the gun is entirely speculative-in fact such evidence might equally well have been prejudicial to" defendant), *cert. denied,* 120 S.Ct. 1219 (2000); *United States v. Vargas*, No. 97-3105, 172 F.3d 922 (table), 1998 WL 886992 at *3 (D.C. Cir. Dec. 1, 1998) (The defendant "claims the government denied him due process . . . by failing to preserve and to produce the videotape from the security camera at McDonald's. Unless, however, a 'defendant is able to raise at least a colorable claim that the [disputed material] contained evidence favorable to [him] and material to his claim of innocence . . . , no Brady violation will be established." '), *cert. denied*, 526 U.S. 1151, 119 S.Ct. 2032 (1999); *Levine v. Scully*, 92 Civ. 8337, 1994 WL 455473 at *5 (S.D.N.Y. Aug. 22, 1994) (no due process violation where missing evidence's exculpatory value was speculative and "one can speculate equally that the absence of this evidence at trial may have been to petitioner's benefit").

**C.      Ground Three:          Presentation of false testimony by the prosecutor**

Petitioner contends that the prosecutor knowingly and intentionally presented false testimony at trial from the victim regarding the date that the victim was introduced to petitioner. The record reveals that on direct examination, the victim testified that she initially met petitioner a few months before the assault occurred on March 26, 1996, but could not remember the exact date. T.62. On cross-examination, the victim specified that she met petitioner for the first time during November or December of 1995. T.79. Petitioner's sister contradicted the victim by testifying that petitioner was incarcerated for seventeen months, ending in January of 1996. T.209-10.

When this claim was raised in petitioner's C.P.L. § 440.10 motion, the state court ruled that it was a matter of record for direct appeal. *See* N.Y. CRIM. PROC. LAW § 440.10(2)(c); Memorandum and Order Dated April 5, 2002 Denying C.P.L. § 440.10 Motion. Petitioner subsequently raised the claim in his *pro se* supplemental brief to the Appellate Division, but failed to include it in his *pro se* application for leave to appeal to the Court of Appeals. As respondent points out, the claim is procedurally barred on two bases, the first of which is the trial court's reliance on the adequate and independent state ground, C.P.L. § 440.10(2)(c), to deny the claim.  As discussed above, Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record. *See Levine v. Commissioner of Correctional Servs.*, 44 F.3d 121, 126 (2d Cir.1995) (refusing to conduct federal habeas review where New York's appellate court found claim to be procedurally barred

under C.P.L. § 440.10(2)(c)); *People v. Santillana*, 145 Misc.2d 567, 547 N.Y.S.2d 981, 982

(N.Y. Sup. Ct.1989) (barring claims pursuant to C.P.L. § 440.10(2)(c) that were not raised on

direct appeal despite sufficient facts in record to allow defendant to do so). Because petitioner

has failed to establish cause and prejudice or a fundamental miscarriage of justice, the claim will

be dismissed. *E.g.*, *Coleman v. Thompson*, 501 U.S. at 750.

### D.    Ground Four: Suggestiveness of the photographic array

Smith argues that the photographic array shown to the victim was unduly suggestive. Due

process requires that criminal trials "proceed consistently with 'that fundamental fairness' which

is 'essential to the very concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d

Cir.1998) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). "When the prosecution

offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense,

fundamental fairness requires that that identification testimony be reliable." *Raheem v. Kelly*,

257 F.3d 122, 133 (2d Cir. 2001). Where a witness has made a pretrial identification, a challenge

to that identification and to an in-court identification of the defendant at trial triggers "a one-step

or two-step inquiry." *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir.1990); *see

also*, *e.g.*, *Raheem*, 257 F.3d at 133.

The first step is to determine whether the pretrial identification procedures were

unnecessarily suggestive which requires asking if it created "a very substantial likelihood of

irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). If the procedures

were not unduly suggestive, then reliability of the identification testimony is a question that goes

to the jury. *E.g.*, *Foster v. California*, 394 U.S. 440, 442 n. 2 (1969); *accord Jarrett v. Headley*,

802 F.2d 34, 42 (2d Cir.1986). If, however, the procedures are found to be unnecessarily

suggestive, the second step is to determine whether the identification testimony is nevertheless admissible because it is "independently reliable rather than the product of the earlier suggestive procedures." *Maldonado-Rivera*, 922 F.2d at 973; *see also Raheem*, 257 F.3d at 133. In sum, "the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." *Id.*

In this case, the sole witness to testify at the pre-trial suppression hearing was the police officer who showed the victim the photo array. The officer testified on direct examination that the victim viewed the array one month after the assault. H.6.[5] The viewing took place at the police station. H.6. Only the victim and the officer were present. H.6. Petitioner's photograph was included in the array because the victim said her assailant was named "Billy" and because another police officer named petitioner as a suspect. H.7. Before the victim was shown the array, the officer said there was a possibility that the assailant was not depicted. H.8. The officer did not suggest any particular selection. H.8. Without equivocation or hesitation, the victim selected petitioner's photo. H.8.

On cross-examination, the officer testified that the victim described her attacker as a "[l]ight skinned black male approximately five foot six, a hundred fifty-five pounds, around 30 years old, short black, curly hair." H.12. The victim also said that she had known petitioner for a couple of months from the neighborhood and that they were acquaintances. H.12-13.

With respect to the preparation of the photo array, the officer testified that he obtained photographs of petitioner and the fill-ins from the station house. H.14. The officer stated that the photo of petitioner was more than ten years old, depicting him at the age of twenty-eight. H.15.

---

[5] Citations to "H.___" refer to the transcript of the pre-trial suppression hearing.

The picture was used because it was the most recent one that the police had. H.16.

The officer also stated that petitioner's photo had a different "tint" than the other photos, that it "jumps right out at you" and that it is "different than the rest." H.19-20. The officer acknowledged that petitioner had longer hair in the photo array than at the time of the hearing. H.17.

In this case, none of petitioner's claims, individually or in combination, establish that the photo array was unduly suggestive. When Smith's suggestiveness claim was raised on direct appeal, the Appellate Division held that "'the viewer's attention is not drawn to defendant's photo in such a way as to indicate that the police were urging a particular selection.'" *People v Smith*, 306 A.D.2d at 861 (quotation omitted). This decision was not contrary to, nor an unreasonable application of, clearly established federal law.

"In evaluating whether or not a photographic array was unduly suggestive, a court must consider several factors, including the size of the array, the manner of presentation by the officers, and the contents of the array." *United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) (citations omitted), *cert. denied*, 513 U.S. 977 (1994). "If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs, or the utterance of suggestive comments before an identification is made, the 'principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Id.* (quoting *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir. 1984)); internal citations omitted).

First, Smith contends that his photograph was larger than the others. With respect to the

size of petitioner's photo, the Second Circuit has stated that such differences do not result in a finding of impermissible suggestiveness, *United States v Marchand*, 564 F.2d 983, 995 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015 (1978), for "[t]he due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subjective influences on witnesses an objective impossibility[,]" *id.* As respondent argues, the size of the image used in the array is not a characteristic unique to petitioner that could have caused the victim to believe the police were suggesting a particular photograph. Therefore, I do not find that any difference in the relative sizes of the photographs resulted in impermissible suggestiveness. *Marchand*, 564 F.2d at 995.

Second, Smith alleges suggestiveness as a result of his photograph being of a different "tint" than the others. Although "tint" refers to color photographs, and the photographs in petitioner's array were all black-and-white, it is assumed that petitioner is talking about the relative lightness of his photograph compared to the other photographs. The trial court found, following the suppression hearing, "[t]here is [sic] two of them with lighter, lighter background; there is [sic] two of them with a little darker background." H.23. Pursuant to 28 U.S.C. §2254(e)(1), this Court must defer to a state court's factual findings unless the habeas petitioner rebuts the presumption and correctness by clear and convincing evidence. This Smith has not done.

In any event, even if petitioner's photograph was lighter or darker than the others, federal law states that the lightness of the photograph does not make a photo array unduly suggestive where the array depicts individuals with similar physical features. *See United States v. Thai*, 29 F.3d 808-09. Because petitioner's array depicts similar individuals, any lightness or darkness in

petitioner's photo compared to the others does not render the array unduly suggestive.

Third, Smith challenges the constitutionality of the photo array based on the delay of one month between the crime and the viewing. Respondent points out that the delay was actually twenty-four days, not one month. H.5-6. The reason for the delay was that the police initially did not have a suspect and the victim was in the hospital recovering from her injuries. H.6. After the victim was discharged, she went to Detroit, Michigan, to visit her sister. H.6. Significantly, petitioner does not explain how he was prejudiced by the delay. If anything, because the victim was told there was a possibility that the suspect was not in the array, the delay was more likely to result in a non-identification. Given that a delay of five months has been upheld in the Circuit, *see Underwood v Kelly*, 692 F. Supp 146, 149-150 (E.D.N.Y. 1988), *aff'd* 875 F.2d 857 (2d Cir.), *cert denied*, 493 US 837 (1989), the twenty-four day delay here did not run afoul of the constitution.

Fourth, petitioner complains that his picture was from 1985, depicting him with longer hair than he had in 1996. The age of the photograph was insignificant. As demonstrated by the backside of the array itself, the photos were taken in 1979, 1983, 1984, 1985, and 1986. *See* Respondent's Memorandum of Law at 27 (citing People's Hearing Exhibit 1). None of the photographs stood out as being newer or older than the others. Petitioner's argument that he had longer hair in the picture from 1985 than he actually had at the time of the crime in 1996 is without merit. As respondent argues, because the difference in hair length more likely would have resulted in the victim's inability to identify rather than a positive identification, it could not have been suggestive. In addition, the testimony at the hearing was not that petitioner had longer hair in 1985 than in 1996, but rather that petitioner had longer hair in the 1985 photograph than

at the suppression hearing. H.17. Thus, I reject petitioner's contention that the length of his hair at the hearing caused the photo array to be unduly suggestive.

Fifth and finally, petitioner mentions that the People's witness at the hearing, a police officer, agreed with defense counsel that petitioner's photo had a "different 'tint' than the other photos, that it 'jump [sic] right out at you.'" Petitioner at 7 (Docket No. 1); *see also* Wade hearing transcript, p. 20. The officer was neither a factual nor legal "expert." Whatever the officer meant, the trial court was not bound to adopt that opinion; rather, the hearing court was required to make, *see* N.Y. Crim Proc. Law § 710.60(6), and did make, its own findings of fact and conclusions of law, to a presumption of correctness applies on habeas review, 28 U.S.C. § 2254(e)(1). As noted above, the trial court found that two photos had a lighter background and two had a somewhat darker background. *See* H.23.

Smith has not established the photograph array was impermissibly suggestive so as to violate his due process rights and, accordingly, Ground Four is dismissed.

### E.      Ground Five: Equal Protection Violation

Petitioner contends that New York's persistent violent felony offender statute, *see* N.Y. PENAL LAW § 70.08; N.Y. CRIM. PROC. LAW § 400.16, violates his rights to equal protection of the laws. Petitioner failed to exhaust this claim in the state courts, but could still satisfy the exhaustion requirement because New York courts have entertained equal protection claims in the context of a motion to set aside the sentence as illegal under C.P.L. § 440.20, which may be filed at any time. Resp't Mem. at 29 (citing *People v. Michael* D., 99 Misc.2d 816 (N.Y. Sup. 1979); *People v. De Perez*, 70 Misc.2d 982 (N.Y. Co. Ct. 1972), *aff'd*, 32 N.Y.2d 880 (N.Y. 1973)). This Court shall exercise its discretion under 28 U.S.C. § 2254(b)(2) to deny this unexhausted

claim on its merits since, under any standard of review, it does not provide a basis for habeas relief.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439-40 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *accord, e.g.*, *Vacco v. Quill*, 521 U.S. 793, 799 (1997). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (citations omitted). "The equal protection clause does not mandate absolute equality of treatment but merely prescribes that, absent a fundamental interest or suspect classification, a legislative classification be rationally related to a legitimate state purpose." *People v Parker*, 41 N.Y.2d 21, 25 (N.Y. 1976) (holding that the former Penal Law providing for second-felony offender status based upon convictions in other states for acts which would not have been felonies in New York, while not providing for second-felony offender status as to the same acts if they were committed in New York, did not deny equal protection; nor did it result in unconstitutional delegation of legislative power or incorporation by reference of statutes of another state). "In applying the rational basis test, [courts] defer to the Legislature, which is presumed to know all the facts that would support a statute's constitutionality -- a presumption which must be rebutted beyond a reasonable doubt. The Legislature's actual purpose need not be apparent, for a statute is constitutional if rationally related to any conceivable legitimate State purpose." *People v Walker*, 81 N.Y.2d 661, 668 (N.Y. 1993) (disparate treatment of in-state and out-of-state felonies under second felony offender

sentencing statute did not violate equal protection). Under this standard, statutes are traditionally granted a strong presumption of constitutionality if a rational relationship exists between the disparate treatment and a legitimate governmental purpose. *See Benjamin v. Jacobson*, 124 F.3d 162, 175 (2d Cir.1997) (citing *Heller v. Doe*, 509 U.S. 312, 319-20 (1993)).

Here, the statutory scheme does not involve a suspect classification, such as race or gender, or impinge on a fundamental right. Thus, it need survive only rational basis scrutiny. *See Griffin v. Mann*, 156 F.3d 288, 291 (2d Cir.1998); *Haag v. Ward*, 632 F.2d 206, 208 (2d Cir.1980); *see also Calhoun v. Walker*, 1999 WL 33504437, at *7 (N.D.N.Y. Feb. 26, 1999). New York state courts have held that Penal Law § 70.08, which increases the minimum sentence for persistent violent felony offender for a period of 10 years, involved neither suspect class nor fundamental interest, and, therefore, was subject to rational basis analysis upon equal protection challenge thereto. *People v. Ward*, 260 A.D.2d 585 (App. Div. 2d Dept. 1999).

Smith contends that "[t]he statute providing for mandatory minimum state prison sentences for anyone convicted of a felony or in any other jurisdiction of [an] offense for which a sentence or term of imprisonment in excess of one year was authorized violates [the] equal protection clause, since identity of [the] prosecutor determines [the] effect of predicate and persistent conviction[s] and [the] provision bears little relationship to [the] statutory objective [of N.Y. Penal Law § 70.06] of increasing punishment of 'hard core' offenders." Petition at 7 (Docket No. 1). Petitioner does not cite any cases, but the language quoted above is taken directly from a New York state case, *People v. Mazzie*, 78 Misc.2d 1014, 1019 (N.Y. Sup. Ct. 1974) (holding that N.Y. Penal Law § 70.06 is unconstitutional if applied to prior crimes from other jurisdictions for which crimes New York State would impose a maximum term of less than

-27-

one year in custody).  State and federal courts in this Circuit have declined to follow *People v. Mazzie*. *E.g.*, *United States ex rel. Mercogliano v. County Court of Nassau County*, 414 F. Supp. 508, 512 (S.D.N.Y. 1976) (citing *People v. Wixson*, 79 Misc.2d 557 (Sup. Ct. Westchester Co. 1974)). The New York Court of Appeals eventually abrogated *Mazzie* in *People v. Parker*, 41 N.Y.2d 21, 24 (N.Y. 1976). *Mazzie* dealt with Penal Law § 70.06, which pertains to the sentence of imprisonment for a second felony offender, while Smith was sentenced under Penal Law § 70.08 as a persistent violent felony offender. Thus, it is arguably not applicable. Even assuming that *People v. Mazzie* is relevant to the facts at hand, it is no longer viable precedent. And, in any event, it does not appear that *Mazzie* is contrary because it dealt with out-of-state predicate felony convictions, which is not the issue here.

As respondent notes, what Smith appears to be arguing is that the prosecutor has discretion in deciding whether to seek sentencing as a persistent violent felony offender, thus violating the equal  protection clause. Contrary to petitioner's contention, New York law mandates persistent violent felony offender sentencing under New York Penal Law § 70.08 whenever there is information available to the prosecutor or the sentencing court indicating that the defendant stands convicted of a violent felony offense and has been previously subjected to two or more predicate violent felony convictions. *See* N.Y. Penal Law § 70.08; N.Y. Crim. Proc. Law § 400.16. Because persistent violent felony offender sentencing is mandatory,[6] not

---

[6]     Courts in this Circuit have summarized New York's two persistent felony offender sentence-enhancing statutes as follows:

New York has two sentence-enhancing statutes for persistent felony offenders. One is the persistent violent felony offender provision in N.Y. Penal Law § 70.08, which practitioners of criminal law in New York often refer to as the "mandatory" one. That statute applies to defendants who stand convicted of a violent felony (as defined in N.Y. Penal Law § 70.02) and have previously been convicted of two or more predicate violent felonies (as defined in N.Y. Penal Law § 70.04(1)(b)). Such defendants receive an indeterminate sentence of imprisonment, the maximum

-28-

discretionary, petitioner has failed to show how "the identity of the prosecutor" in any way affected his sentencing. Petitioner's equal protection claim must be dismissed.

## VI.     Conclusion

For the foregoing reasons, the Court denies petitioner William Smith's request for a writ of habeas corpus and dismisses the petition. Since the petitioner has failed to make a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: August 7, 2009
        Buffalo, New York.

_____

of which must be life. Minimum terms are prescribed by the statute as well and vary depending on the grade of the offense of conviction. *See* N.Y. Penal Law § 70.08(3). . . . Under § 70.08, "the court must impose" an enhanced penalty once it finds that the predicate convictions occurred, id. at § 70.08(2) (emphasis added), hence the use of the shorthand "mandatory" to describe that form of sentence enhancement.

The second persistent felony offender statute is N.Y. Penal Law § 70.10. This statute is designed to provide enhanced punishment for recidivists who fail to qualify as mandatory persistent violent felony offenders under § 70.08. It characterizes as a "persistent felony offender" any defendant who stands convicted of a felony and has two prior felony convictions (whether or not they are for violent felonies) as defined in the statute. *See* N.Y. Penal Law § 70.10(1)(a)-(c). As an enhanced penalty for such offenders, § 70 .10 provides that, in lieu of the sentence otherwise authorized by the penal law, persistent felony offenders "may" be sentenced as though the offense of conviction were a class A-1 felony. *Id.* (emphasis added). . . .

*James v. Artus*, No. 03 Civ. 7612, 2005 WL 859245 at *15-16 (S.D.N.Y. Apr. 15, 2005) (citations omitted).